# EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust,[2] | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ (JKS) |
| Pinttosoft LLC, | |
| Defendant. | |

## <u>DECLARATION OF JAMES P. BRENNAN</u>

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

## I.  **My Background**

1.      I am a forensic accountant with over 20 years of experience conducting analyses and providing expert testimony in matters involving accounting fraud, Ponzi-schemes, financial crimes, and asset-tracing and recovery.  I have experience in forensic accounting and investigations in fiat and cryptocurrency.

---

[1]   The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "<u>Debtors</u>" or "<u>Prime</u>").  The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]   PCT Litigation Trust ("<u>Plaintiff</u>" or "<u>PCT</u>") was established for the primary purpose of pursuing litigation and distributing assets.  PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

2.      I am a Senior Managing Director and Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held.  J.S. Held is a global professional service firm which provides technical, scientific, and financial advisory services.

3.      Prior to working at J.S. Held, I held positions at other investigation firms, including FTI Consulting, Alvarez & Marsal, and Kroll.  In these positions, I managed teams responsible for investigations involving money laundering, terrorist financing, Ponzi-schemes, asset theft, and other fraudulent activities, as well as asset-tracing and recovery.

4.      I hold both a B.S. and a M.S. in accounting from St. John's University.  I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5.      A copy of my resume is attached hereto as **Exhibit 1**.

6.      I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions.  A significant amount of my practice and experience involves advising on crypto-related matters.

7.      I am routinely retained to perform analyses of information related to financial crimes, which include forensic investigations and flow-of-funds analyses related to crypto digital wallet addresses and fiat bank accounts.

8.      I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

9.      I also train domestic and international government entities concerning cryptocurrency and financial crimes.  These entities include, among others, the U.S. Department of Justice, U.S. Department of Homeland Security, and U.S. Bankruptcy Courts.

10.     I submit this Declaration in support of PCT's complaint against Pinttosoft LLC ("Pinttosoft").

11.     In connection with this Declaration, I reviewed testimony from former Prime executives and employees.

12.     I also reviewed Prime's bank account information at various financial institutions, including BMO Harris ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB"), Prime's Internal Ledger (the "Internal Ledger"), API Log audit data, bank statement data, and blockchain data.

13.     Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (i) my personal knowledge and/or on information provided to me by Prime, former Prime management and employees, Wind-Down Debtor, the Plan Administrator, and/or the Plan Administrator's professionals; or (ii) my review of relevant documents.

14.     Except as otherwise indicated herein, all conclusions and opinions set forth in this Declaration are based on: (i) the facts as known to me, including those set forth herein; (ii) my experience and knowledge of Prime's operations; and (iii) my experience and training as a professional.

15.     The opinions and conclusions expressed herein are subject to change based on additional data, facts, and information that may be received after this Declaration is executed, including, among other things, additional data, facts, and information that becomes available in the public domain or that is made available by the Wind-Down Debtor, the Plan Administrator, or other parties during discovery or otherwise.

## II.    Background on Crypto

16.    The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ether ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

17.    All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

18.    There are a number of different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

19.    Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique Ethereum digital addresses, which are derived from public keys. These Ethereum digital addresses are 40-character

-4-

hexadecimal strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these digital addresses, including any time crypto is traded or any time a smart contract is used.

20.    Similarly, on the Bitcoin blockchain, digital wallets and their respective holdings are identifiable to the public by unique Bitcoin digital addresses, which are derived from public keys. Bitcoin digital addresses are shorter, hashed versions of public keys, which are digital addresses with long alphanumeric strings.

21.    "Private keys" are essentially individual passwords used to denote ownership of a particular blockchain wallet.  Like public keys, private keys similarly consist of multi-digit alphanumeric strings.  However, unlike public keys—which are knowable by the public and used simply to identify a digital address—private keys are known only by the owner of the digital wallet and used by the owner to access and manage the digital wallet.

22.    Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets have no third party that is taking custody of the crypto.

23.    Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures" to access and transact with the crypto stored on the digital wallet.

24.    Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction on the blockchain.  The exact amount of gas fees for a particular transaction can fluctuate based on factors

such as the size of the transaction, supply, demand, and network activity at the time the transaction is made.

25.      However, on the Bitcoin blockchain, these are referred to simply as "transaction fees." Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."[3]  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain.  Similar to gas fees in the case of ETH, the exact price of the transaction fee for a particular Bitcoin transaction can fluctuate based on factors such as the size of the transaction (in terms of bytes), supply, demand, and network activity at the time the transaction is made.

26.      Furthermore, a key distinction in how transaction fees are determined on the Bitcoin network compared to other blockchains is the protocol's Unspent Transaction Output ("UTXO") model.[4]  While other blockchains such as Ethereum utilize an account-based system, where digital wallet balances are adjusted based on transaction activity, Bitcoin's system is often compared to physical cash because the "input"[5] for a Bitcoin transaction is typically compiled of various UTXOs (representing various amounts of BTC) that it previously received.  If the value of the UTXO is not the exact equivalent of the desired amount, "change" is then sent back to the sender in the form of a new UTXO.[6]

---

[3]    *See* FIDELITY DIGITAL ASSETS, "Bitcoin and Ethereum Fees Explained," *available at*: https://www.fidelitydigitalassets.com/research-and-insights/bitcoin-and-ethereum-fees-explained.

[4]    A UTXO is the "unspent" amount of BTC or "change" that is left over from a digital wallet sending BTC to another digital wallet.

[5]    An "input" is the amount of BTC being sent from a digital wallet to another digital wallet.

[6]    *See* KRAKEN, "What is a Bitcoin unspent transaction output (UTXO)?", *available at*: https://www.kraken.com/learn/what-is-bitcoin-unspent-transaction-output-utxo.



27.    The number of UTXOs (representing various amounts of BTC) in a transaction impacts its data size, and this in turn is reflected in the transaction fee. The more UTXOs (representing various amounts of BTC) required to complete the transaction, the higher the cost of processing it will be.[7] This is because transaction fees are calculated by a certain number of satoshis[8] (0.00000001 BTC) per byte of data.[9] Oftentimes, sophisticated traders or entities will consolidate their UTXOs (representing various amounts of BTC) by sending funds to themselves during off-peak hours, to reduce the transaction fee for when they send the funds outward in the future.

## III.    Prime's Crypto Commingling

28.    Prime did not maintain separate or segregated digital wallets for crypto that its customers transferred to Prime. Rather, Prime held and commingled the crypto transferred by its

---

[7]    *See* RIVER, "Bitcoin's UTXO Model: What Is It and How to Manage UTXOs", *available at*: https://river.com/learn/bitcoins-utxo-model/.

[8]    A satoshi is the smallest unit of Bitcoin and essentially measures the size of the transaction.

[9]    *See* BITSTAMP, "How are BTC transaction fees determined?", *available at*: https://www.bitstamp.net/learn/blockchain/how-are-btc-transaction-fees-determined/.

various customers in omnibus digital wallets ("Omnibus Digital Wallets"), where it was further commingled with crypto that Prime used for its own corporate operations and purposes.

29.     The shared Omnibus Digital Wallets were contained in Prime's vaults ("Vaults") with Fireblocks LLC ("Fireblocks").[10]  Prime used Vaults within its Fireblocks infrastructure to organize digital wallets (including the Omnibus Digital Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.

30.     Each Prime customer was provided with its own unique deposit digital wallet address ("Deposit Digital Address") in order to transfer crypto to Prime.

31.     Prime would periodically "sweep," in other words, collect, all of the crypto that had been transferred to Deposit Digital Addresses and then transfer that crypto to one or more of the shared Omnibus Digital Wallets controlled by Prime.  This "sweeping" or collection process commingled the crypto that various customers transferred to Prime.

32.     Prime utilized inconsistent methods for sweeping Deposit Digital Addresses.  Prime maintained an application that could trigger a sweep based on certain events occurring such as a withdrawal request.  A Prime employee also could manually perform a sweep at any given time.

33.     Prime regularly transferred crypto between its Omnibus Digital Wallets, further commingling the crypto that customers transferred to Prime.  It does not appear that Prime used a consistent or defined process for transfers between its Omnibus Digital Wallets.

---

[10]   Fireblocks is a third-party crypto security platform which provides infrastructure for moving, storing, and issuing crypto.  Prime used Fireblocks to hold and manage its crypto.  "Vaults" are storage solutions for crypto that group multiple digital wallets in a single, central location.  "Vaults" can be managed more efficiently as a group and provide enhanced security across all digital wallets within a Vault.

34.      Since Prime did not maintain segregated digital wallets for each of its customers and the crypto at Prime was commingled (similar to fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers.

35.      Prime would credit a customer's balance on its Internal Ledger for any crypto that a customer sent to Prime through its unique Deposit Digital Address.  The Internal Ledger did not (and could not) track which of the Omnibus Digital Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was commingled with crypto other customers had transferred to Prime as well as with Prime's own crypto within and across multiple Omnibus Digital Wallets.

36.      Prime implemented various mechanisms to minimize transaction fees paid on crypto transfers.  For example, Prime implemented a Gas Station mechanism to reduce the payment of gas fees on the Ethereum blockchain by consolidating ETH, USD Coin ("USDC"), or Tether ("USDT") transactions, respectively.   In doing so, the transfer of ETH, USDC, or USDT between various Deposit Digital Addresses, Prime Omnibus Digital Wallets, and Prime Gas Station Wallets further commingled the crypto held at Prime.

37.      Likewise, for BTC transactions, Prime minimized transaction fees by sweeping UTXOs (representing various amounts of BTC) into the transaction, also resulting in further commingling crypto when Prime transferred BTC between various Deposit Digital Addresses and Prime Omnibus Digital Wallets.

38.      Based on my experience, Prime's haphazard transferring of crypto, lack of defined processes and procedures, and deficient record keeping are red flags of potential fraud.  At a minimum, it demonstrates poor asset management and suggests that Prime was moving crypto around

to manage customers' outgoing transfer requests or Prime's own needs without consideration of the ultimate negative impact such management had on the business overall.

39.    Prime did not perform regular reconciliations to compare the crypto recorded in its Internal Ledger with the crypto Prime actually held in its Omnibus Digital Wallets.

40.    When a customer requested to transfer crypto from Prime, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of crypto to Prime sufficient to support the transfer request.  Prime then checked its multiple Omnibus Digital Wallets to determine which one(s) held sufficient crypto to satisfy the customer's transfer request.  Prime would then transfer crypto from an Omnibus Digital Wallet(s) with sufficient crypto to the customer. Prime did not transfer crypto to the customer from the original Deposit Digital Address the customer had used to transfer crypto to Prime, or even necessarily from the original Omnibus Digital Wallet(s) where that customer's crypto had initially been swept.  In other words, the crypto Prime would send to a customer to satisfy an outgoing transfer request was not the same crypto that the customer had originally sent to Prime.

41.    Based on my review of Prime's company records, such as the Internal Ledger, and blockchain data, I have identified several illustrative examples of the crypto commingling that occurred at Prime.  The diagrams in this Declaration feature specific relevant examples to illustrate the concepts discussed in the Declaration and do not reflect the full scope of all of the blockchain activity in each diagram.  These examples are described below.

   **A.    Prime Omnibus Digital Wallet ~b2ea (ETH Example)**

42.    One Omnibus Digital Wallet frequently used by Prime has the digital address ending in ~b2ea (the "~b2ea Wallet").

43.    Like Prime's other Omnibus Digital Wallets, the ~b2ea Wallet received crypto from Deposit Digital Addresses through the periodic sweeps that Prime conducted.

44.    The diagram[11] below (based on blockchain data) depicts three different Prime customers transferring crypto into different Deposit Digital Addresses at Prime, and Prime sweeping the crypto from the Deposit Digital Addresses into its omnibus ~b2ea Wallet:



45.    Thus, as demonstrated above, the ~b2ea Wallet (like all of Prime's Omnibus Digital Wallets) contained commingled crypto transferred to Prime by various customers.

46.    Another example of incoming transfers that the ~b2ea Wallet received were transfers from a different Prime digital wallet that Prime referred to as the "PT Segregated Assets" wallet ("PT Segregated Assets Wallet").

47.    The PT Segregated Assets Wallet was intended to keep Prime's corporate crypto separated from the crypto transferred to Prime by its customers, which would have been proper practice.  However, in practice, this segregation did not actually occur.  The PT Segregated Assets

---

[11]    In the diagrams in the Brennan Decl., all digital wallets and Deposit Digital Addresses are referred to by the last four digits of their digital addresses.

Wallet contained crypto transferred from a Prime Omnibus Digital Wallet, which itself contained crypto transferred to Prime by thousands of customers via Deposit Digital Addresses.

48.    Despite its internal label "PT Segregated Assets", I observed that ETH was transferred from the PT Segregated Assets Wallet to the omnibus ~b2ea Wallet which contained commingled crypto transferred to Prime by various customers.  For example, in March 2022, the PT Segregated Assets Wallet transferred 194 ETH to the ~b2ea Wallet.

49.    The diagram below illustrates how crypto transferred to Prime by Customer A was subsequently commingled in the ~b2ea Wallet with crypto from the PT Segregated Assets Wallet. The same ~b2ea Wallet was then used to satisfy outgoing transfer requests of other Prime customers, including Customer B and Customer C.  Therefore, in this example, the outgoing crypto transfers to Customer B and Customer C may have included some of the crypto transferred by Customer A along with crypto from other customers who had transferred crypto to the ~b2ea Wallet.



50.    Similarly, the diagram below provides an example of how five different Prime Omnibus Digital Wallets transferred crypto amongst one another in a manner that appears entirely arbitrary and haphazard.



51.     In my experience, it is uncommon for such a high volume of transfers to occur amongst digital wallets controlled by a single entity.  I have been unable to ascertain a business purpose or rationale for the frequent transfers of crypto that Prime conducted between its different Omnibus Digital Wallets.

52.     The extensive commingling of crypto in Omnibus Digital Wallets at Prime makes it impossible to specifically attribute any crypto to a particular customer.

**B.     Prime Omnibus Digital Wallet ~73ck Illustration (BTC Example)**

53.     Another Omnibus Digital Wallet frequently used by Prime has the digital address ending in ~73ck (the "~73ck Wallet").

54.     This omnibus ~73ck Wallet was used for BTC transactions and held BTC transferred to Prime from numerous customers as well as BTC transferred into the ~73ck Wallet from other Prime Omnibus Digital Wallets, which in turn also held BTC transferred to Prime by multiple

customers and BTC transferred from other Prime Omnibus Digital Wallets.  This resulted in extensive commingling of BTC within Prime's Omnibus Digital Wallets, as reflected in the diagram below.



55.     Similar to the ~b2ea Wallet example discussed herein for ETH, I have been unable to ascertain a business purpose or rationale for the frequent transfers of BTC between Prime's different Omnibus Digital Wallets.

**C.     Prime Omnibus Digital Wallet – ~df94 (USDT Example)**

56.     ETH is also used to pay gas fees associated with USDT transactions, which were other types of crypto transactions that caused further commingling of crypto transferred to Prime by customers.

57.     The diagram below illustrates a customer transaction involving USDT.  The customer ("Customer A") purchased USDT on a crypto exchange and then transferred USDT to a Deposit

Digital Address at Prime.  The USDT was then swept into one of Prime's Omnibus Digital Wallets with the digital address ending in ~df94 (the "~df94 Wallet") where it was immediately commingled with USDT that had been transferred to Prime by other customers.  Since USDT transactions occur on the Ethereum blockchain, ETH is needed to pay the gas fee to transfer the USDT from the Deposit Digital Address into the Omnibus Digital Wallet.  In this scenario, ETH from Prime's Omnibus Digital Wallet is used to cover the gas fees.  Since Customer A is only transacting in USDT, the ETH required for the transaction must be supplied from other ETH already held in the ~df94 Wallet.



58.    As a result, in this example, not only is the USDT that Customer A transferred to Prime commingled in the ~df94 Wallet, but also the ETH that was used to pay for the gas fees was commingled ETH, which further commingled the crypto at Prime.

59.    This example demonstrates how transactions involving USDT resulted in commingled USDT as well as further commingled ETH, making it practically impossible to differentiate between USDT transferred to Prime by one customer as compared to another Prime customer.

**D.    Prime's Crypto Transaction Fees**

60.    Based on my experience, Prime likely performed sweeps of each crypto type from the Deposit Digital Addresses into Omnibus Digital Wallets to pool crypto together to create certain efficiencies.

61.    Crypto transfers between different Prime's Vaults within Fireblocks occur on-chain, meaning that Prime would have to incur transaction fees when transferring crypto between Vaults at Fireblocks.

62.    To avoid transaction fees, Prime could simply adjust crypto entries on its Internal Ledger to avoid conducting any actual transactions on the blockchain, which would have otherwise incurred transaction fees.  By doing this, the crypto would technically remain in the same original Omnibus Digital Wallet, but the Internal Ledger would now attribute a new value to the customer.

63.    To reduce transaction fees that could not be avoided entirely through Internal Ledger entries, Prime could pool transactions and perform them during off-peak hours when the blockchain network was less congested and thus less expensive.  Thus, by pooling and commingling crypto into Omnibus Digital Wallets, Prime was able to reduce transaction fees.

### i.    *BTC Transaction Fees*

64.    When a customer requested a transfer of BTC from Prime, a fee would be incurred since the transaction would occur on-chain.  Prime minimized these fees by sweeping UTXOs (representing various remaining amounts of BTC) from other customer Deposit Digital Addresses into the same transaction.  Therefore, Prime satisfied a BTC transfer request by transferring crypto to a customer that had been transferred to Prime by other customers.

65.    The diagram below provides an example of a transaction in which BTC transferred from Prime Omnibus Digital Wallet with a digital address ending in ~vk39 (represented by the green node below) (the "~vk39 Wallet"), as well as BTC transferred to Prime from six unique customers (each represented by different color nodes below) using multiple Deposit Digital Addresses, were swept together into a single transaction.  In this example, Customer A (represented by the yellow node below) requested a transfer of 16.56 BTC.  Prime swept UTXOs (representing various remaining amounts of BTC) from eleven Deposit Digital Addresses into the transaction, as reflected by the black diamond below which serves as a central point at which the UTXOs were aggregated and swept into the transaction.  Customer A received 16.56 BTC as requested, and the remaining BTC left over from the transaction became a single UTXO which was sent back to a Prime Omnibus Digital Wallet.  The combination of transactions reduced transaction fees for the next outgoing transfer request because twelve UTXOs (representing various amounts of BTC) from eleven Deposit Digital Addresses and one Prime Omnibus Digital Wallet were combined.



66.     In this single transaction depicted above and reflected in the chart below, although Prime swept BTC transferred from six different customers and the ~vk39 Wallet (totaling 12 UTXO amounts), only two digital wallets received BTC in this transaction: Customer A received 16.56 BTC to an external digital wallet ending in ~p2wu and Prime received the remaining 0.699 BTC to the ~vk39 Wallet, which is now one UTXO.

| Transaction Parties | Amount of BTC Swept | UTXO Count | Amount of outgoing BTC transferred | Resulting UTXO Count |
|---|---|---|---|---|
| Customer A | 0.002 | 1 | 16.561 | 1 |
| Customer B | 0.0569 | 3 | 0 | 0 |
| Customer C | 0.0007 | 1 | 0 | 0 |
| Customer D | 2.9011 | 2 | 0 | 0 |
| Customer E | 0.1921 | 3 | 0 | 0 |
| Customer F | 5.5 | 1 | 0 | 0 |
| Prime Omnibus Digital Wallet ~vk39 | 8.6079 | 1 | 0.6997 | 1 |
| **Total** | **17.2607** | **12** | **17.2607** | **2** |

67.     As a result, the single UTXO remaining in the ~vk39 Wallet contained a combination of BTC transferred from six different customers in addition to BTC transferred from the ~vk39 Wallet.  Accordingly, for subsequent transactions involving the ~vk39 Wallet, it is practically impossible to distinguish which digital wallet the remaining 0.699 BTC originated from.

68.     This example demonstrates how in a single transaction, BTC that Customer A transferred to Prime was commingled in a single transaction.  Prime conducted over one million BTC transactions, and therefore, commingled BTC extensively, rendering it impossible to differentiate between the BTC that each customer transferred to Prime from other BTC at Prime.

### *ii.    ETH Gas Fees (for ETH, USDT, and USDC Transactions)*

69.     Similar to transfers of BTC between Prime's Vaults within Fireblocks, transfers of ETH, USDT, or USDC between Prime's Vaults within Fireblocks also occur on-chain.  Prime thus incurred gas fees when transferring ETH, USDT, or USDC between Vaults at Fireblocks.  Prime incurred ETH gas fees when transferring USDT and USDC because ETH is needed to pay for gas fees to transfer USDT and USDC on the Ethereum blockchain.

70.     Gas fees can be reduced by pooling transactions and performing them during off-peak hours when the blockchain network is less congested.  Thus, by pooling crypto in Omnibus Digital Wallets in Prime's Vaults at Fireblocks, Prime was able to conduct grouped transactions for the purpose of incurring reduced gas fees.

71.     To help pay for these gas fees, Prime set up additional digital wallets which it referred to collectively as "gas stations" ("Gas Stations").  Prime funded the Gas Stations from its other digital wallets (including Prime Omnibus Digital Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.

72.    Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the crypto transferred to Prime by its various customers with Prime's own crypto.

73.    Within Prime's Fireblocks infrastructure, I have identified two Gas Stations (represented by the two bright green nodes in the below diagram):

(i)    Prime Gas Station ~6898

(ii)    Prime Gas Station ~575d

74.    These Gas Stations received ETH transferred from Prime's Omnibus Digital Wallets (represented by the green nodes at the top of the below diagram), customers' external digital wallets (represented by the pink, blue, red and yellow nodes in the below diagram), as well as several external digital wallets that do not appear to be attributable to Prime or its customers (represented by the gray nodes in the below diagram).



75.    I also have observed instances where Prime's operations personnel used fiat from one of Prime's commingled bank accounts to purchase ETH to refill the Gas Stations.

76.    For example, on April 26, 2022, a former Prime operations team employee submitted a request form for $4,290 "to purchase 1.5 ETH to refill the gas station" (the "April 26, 2022 Request

Form"), as shown below. The April 26, 2022 Request Form sought to transfer funds from one Santander bank account, with the account name "Prime Trust Operating Account," to a different Signature bank account, with an account name "T&C WIRE Clearing." Based on my review of bank records, this Signature bank account held commingled fiat transferred to Prime by customers and, as demonstrated by this request, also held fiat used for Prime's operations.



77.     The April 26, 2022 Request Form asked if the transfer required a "ledger update". The Prime employee who completed the April 26, 2022 Request Form indicated "No", which indicates that the internal transfer of fiat between operating and customer bank accounts would not be recorded in Prime's Internal Ledger.

78.     The Gas Stations were funded by Prime's operational fiat, ETH from commingled Omnibus Digital Wallets (including the ~b2ea Wallet described above), ETH transferred by customers from external digital wallets, as well as ETH transferred by other external digital wallets.

79.    In several instances, the amount of ETH sent to Deposit Digital Addresses exceeded the amount of ETH required to pay the gas fees.  In those scenarios, Prime would either leave the excess ETH in the Deposit Digital Addresses to pay the gas fees for future crypto transfers or, in some instances, would send the excess amount of ETH back to the Omnibus Digital Wallets.

80.    As a result, Prime's operational crypto was commingled with crypto transferred to Prime by customers.

## IV.    Prime's Fiat Commingling

81.    Prime held and commingled fiat that customers transferred to it in omnibus bank accounts along with fiat transferred to it by thousands of Prime's other customers and fiat Prime generated from its business operations.

82.    Since fiat that customers transferred to Prime was commingled with fiat from other customers and fiat Prime generated from its business operations, Prime was forced to rely on its internal ledger (the "Internal Ledger") to keep track of transactions to identify how much Prime owed each of its customers.[12]  I was provided and reviewed Internal Ledger data.

83.    Prime also transferred funds between bank accounts that contained fiat transferred to Prime from customers and bank accounts that primarily contained fiat Prime generated from Prime's business activities.  These internal transfers further commingled fiat.

84.    According to the Internal Ledger, bank account statements, and bank reconciliation files I reviewed, Prime regularly made internal transfers between Prime's bank accounts.  Prime would move funds between its different bank accounts, regardless of the source of funds, on an as-needed basis to satisfy wire and Automated Clearing House ("ACH") requests.

---

[12]    Deposition of ▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▮▮▮ Dep."), 89: 19–25.

85.     Prime had numerous bank accounts at different banks depending on the time period. Based on my review of the bank statements, during a given period, certain bank accounts were primarily used depending on the type of transaction.  For example, Prime predominantly used one omnibus bank account at BMO ("BMO x3077"), for incoming and outgoing wire transfers during 2023.

86.     BMO x3077 contained commingled funds that had been transferred to it from Prime's other bank accounts as well as directly from Prime customers.

87.     A large volume of debits and credits occurred almost daily to and from BMO x3077. However, Prime's bank statements for BMO x3077 only include reference numbers regarding the movement of funds into or out of that account.  There are no other details within the bank statements. This makes it difficult to determine who was transferring funds into Prime and the recipients of outbound transfers.

88.     Prime also would regularly make internal transfers from BMO x3077 into a different omnibus bank account at BMO ("BMO x9934") to earn a higher rate of interest.  Most of the unused funds left in BMO x3077 at the end of each day would be transferred back to BMO x9934 as BMO x9934 provided a higher rate of interest than BMO x3077.  Transfers between the bank accounts were described in Prime's bank statements as "PC Transfers".

89.     It appears that the vast majority of funds contained in BMO x9934 were commingled funds that had been transferred into BMO x9934 from the commingled BMO x3077 account. BMO x9934 also contained some funds that had been transferred into it from other commingled bank accounts held by Prime, such as CRB and Signature bank accounts.

90.     These CRB and Signature bank accounts operated in a largely similar manner as BMO x3077—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers.

91.     For instance, "CRB x9892" was an omnibus bank account at CRB utilized by Prime. This account was used primarily for internal transfers and payments via automated clearing house ("ACH").  Thus, during 2023, it appears that Prime primarily utilized either BMO x3077 or CRB x9892 depending on whether Prime needed to make transfers via wire or ACH.

92.     Due to the extensive commingling of funds within Prime's omnibus bank accounts, the funds held within these omnibus bank accounts cannot be attributed to specific customer deposits or withdrawals.

93.     Prime bank statements reflect the movement of funds between Prime bank accounts but do not include details sufficient to identify where those funds originally came from, whom they were being transferred to, or for what reason they were being transferred.

94.     Transfers between Prime accounts usually occurred in round dollars, as opposed to specific amounts based on specific transactions.  This suggests that Prime likely estimated the amount of funds to transfer instead of transferring specific funds in response to specific transaction activity. This practice further adds to the difficulty in connecting transfers with specific transactions reflected in Prime's Internal Ledger.

95.     Based on my experience, numerous internal transfers amongst bank accounts without accurate recordkeeping can be indicative of fraud.  It also can suggest that an entity is facing cash shortfalls and is moving funds around to manage funds in a manner to satisfy withdrawals or other immediate, pressing cash needs.

## V.    Prime's Inadequate Reconciliation Processes

96.    According to Prime's records and sworn testimony from former employees, Prime did not perform regular or timely reconciliations of accounts and, at least before March 2021, any reconciliations that Prime conducted were manual.[13]

97.    Reconciliation processes are critical internal controls.  They enable companies to identify potential errors or fraud so that their books and records are accurate.  They also permit companies to validate the amount of cash that the company holds.  Reconciliation processes typically consist of comparing transactions or other financial activities between the company's internal records and the bank records to verify the data and the proper amounts of account balances.

98.    For Prime's fiat, reconciliation processes generally consisted of comparing the amounts and transaction activity reflected on Prime's Internal Ledger during a given time period with the bank account activity during that same time period.

99.    ███████ ("███████"), Prime's former SVP of Operations and Reconciliations, largely designed Prime's reconciliations processes.  ███████ explained:

Q:    Okay.  And when you moved into your new role in March of 2021 as operations and reconciliations, what was the reconciliations piece?

A:    Prime Trust did not have reconciliation tools, essentially.  So my responsibility was in kind of designing the reconciliation tools.

Q:    What's a reconciliation tool?

A:    Somebody makes a request for a transaction: How can you basically reconcile that it occurred.  If that makes sense.

Q:    Can you—can you expand a little bit?  So a customer says, I want to buy Bitcoin?

---

[13]    *See* Deposition of ███████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "███ Dep."), 19:23 - 20:13.

A:    Yeah.  So, well, it wouldn't be necessarily for the purchases, but, for instance, a client's account says that they have one Bitcoin in their account. Can you confirm that it was received on the Ledger.

Q:    Okay.  So you're confirming that you actually have the assets that your client's accounts are reflecting they have; is that right?

A:    In a way, yeah.  So it was assuming that if we had assets displayed, you know, do we actually have them.[14]

100.    ▮▮▮▮▮▮▮▮ ("▮▮▮▮▮▮"), Prime's former Chief of Regulatory Affairs, described "reconciliations" as "taking the general ledger and reconciling it to a bank statement; taking customer, you know, account statements and reconciling those to the bank statement wherever those assets may be held.  When I say assets, I'm talking about Fiat."[15]

101.    Both ▮▮▮▮▮▮ and ▮▮▮▮▮ testified as to the insufficiency of Prime's reconciliation processes during their tenures with Prime.

102.    ▮▮▮▮▮ testified: "Reconciliations were not being done in a timely manner."[16]

103.    ▮▮▮▮ discussed Prime's reconciliations process both before and after March 2021:

A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated . . .

. . .

Q:    Okay.  So you weren't—you weren't responsible for fixing whatever happened prior, you were responsible for forward-looking projects for reconciliation; is that the idea?

A:    Yeah, I was—I was put in that position to essentially build the automated systems for transactions looking forward.  Once the system was, I guess you can say, built, you know, I was let go of the responsibilities of building

---

[14]    ▮▮ Dep., 18:3–19:7.

[15]    ▮▮▮▮ Dep., 16:4–9.

[16]    *Id.* at 38: 23–24.

it, and there were teams that were brought on to essentially do the reconciliation.[17]

104.    For crypto, Prime's reconciliation processes were in the beginning stages of being developed in early 2022 and generally consisted of comparing the amounts and transaction activity reflected on Prime's Internal Ledger and Prime's Fireblocks environment.

105.    I also reviewed internal Prime communications concerning commingling of fiat and crypto as well as asset reconciliation.

106.    For example, on December 17, 2022, ██████████ ("██████████"), Prime's former General Counsel, sent an email to several Prime employees concerning a Nevada Financial Institutions Division ("Nevada FID") request for information regarding Prime's statement that it "invested in additional Ether[e]um using fiat currency from its omnibus accounts."[18]    Specifically, Nevada FID requested that Prime "[p]lease provide a list of clients impacted from the investment and which omnibus accounts were utilized."[19]

107.    On December 19, 2022, ██████ responded: "Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger?  If so, I don't believe any specific bank accounts were used, *as management considered all funds tangible in our omnibus model*.  In their decision, no bank movements were needed/done before the credits were requested to the ledger."[20]

---

[17]    ██████ Dep., 19:25–20:5; 21:14–22:2.

[18]    ██████ Dep., Ex. 28 (internal quotations omitted).

[19]    *Id.*

[20]    *Id.*

108.    On December 28, 2022, ████████████, former SVP and Head of Banking and Trust Operations, responded: "████, ████, and I met today.  We are in agreement that we are not able to specify what customer is out of the funds due to our omnibus structure."[21]

109.    Given the above testimony from former executives, it is clear that Prime did not perform regular or timely reconciliations, which demonstrates that Prime lacked critical internal controls.  Based on my experience, without such internal controls, companies cannot readily identify potential errors or fraud to verify and ensure that their data and records are accurate.  Therefore, Prime did not have adequate safeguards or processes in place to validate the amount of fiat and crypto that the company held and accurately attribute the proper balances to Prime customers.

## VI.    The 98f Wallet Caused Further Commingling of Fiat and Crypto

110.    The most notable example of Prime's commingling of both fiat and crypto and its failure to reconcile its Internal Ledger was when Prime used fiat transferred to it by its customers to make purchases of ETH to replace ETH that was locked in an inaccessible "multi-sig" digital wallet (the "98f Wallet").[22]

111.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer from Prime of 5,867.71 ETH (worth approximately $24,000,000.00 at the time[23]).  At this time, Prime realized that Abra had been

---

[21]    *Id.*

[22]    A "multi-sig" digital wallet requires digital signatures of multiple individuals to access and transact with the crypto stored on the digital wallet.  The "98f Wallet" is referred to herein as such because it has a digital address ending in the characters "98f."

[23]    Price data was obtained from CoinGecko.com.  The monthly closing price for ETH (which was approximately $4,085) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

transferring ETH into a forwarder digital wallet[24], which automatically had been forwarding the ETH into the inaccessible 98f Wallet.

112.    By December 2021, Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000.00 at the time[25]) into the 98f Wallet.

113.    Prime decided to satisfy Abra's December 2021 (and subsequent) ETH transfer requests by using fiat transferred to Prime by other customers to purchase replacement ETH from one of Prime's liquidity providers ("Liquidity Provider").

114.    Regarding this decision to use commingled fiat to purchase replacement ETH from Liquidity Provider, ███████ ("███████"), Prime's former Chief Operating Officer, testified as follows:

> Q:    So [Customer is] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to ███ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?

---

[24]    A "forwarder digital wallet" is a type of digital wallet that automatically sends crypto that the digital wallet receives to another digital wallet.  This is often used by businesses to enhance security and streamline operations.

[25]    Price data was obtained from CoinGecko.com.  The monthly closing price for ETH (which was approximately $4,085) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

A:      Funds from the fiat account.  Fiat omnibus account.  Is my understanding.
Once again, ▓▓▓ would know specifically.[26]

115.    Abra continued to request ETH transfers, meanwhile the ETH in the 98f Wallet

remained inaccessible.  Between December 23, 2021 and March 30, 2022, Abra requested that Prime

transfer a total of 48,034.57 ETH (worth approximately $145,000,000.00 at the time[27]).  Prime

continued to use commingled fiat to purchase replacement ETH from Liquidity Provider.  During

that same period, Prime recorded ten different wires to Liquidity Provider's account, which

purportedly represented new fiat transferred into Liquidity Provider's account to cover the ETH

purchased from Liquidity Provider, as shown in the table below.

| Date | USD Internal Ledger "Wire" Transfer[28] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250.00 |
| 1/6/2022 | $2,778,400 | 800.00 |
| 1/6/2022 | $7,293,300 | 2,100.00 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800.00 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000.00 |
| 3/29/2022 | $7,902,800 | 2,300.00 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

---

[26]    Deposition of ▓▓▓▓, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▓▓▓ Dep."), 92:25–93:18.

[27]    Price data was obtained from CoinGecko.com between the dates of December 23, 2021 and March 30, 2022.  The price for ETH (which was approximately $3,031) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the time period..

[28]    Prime did not actually execute any of these wire transfers.  *See* ▓▓▓ Dep., 164:22–165:10.

116.    As Prime did not actually receive any new funds, Prime used the commingled fiat that had been transferred to it by its customers to fund these replacement ETH purchases from Liquidity Provider.

117.    The below diagram illustrates ten of the replacement ETH purchases that Prime made from Liquidity Provider, which it ultimately used to satisfy the withdrawal requests of Abra.



118.    Because the ETH that Abra had originally transferred to Prime was (and still is to this day) locked away in the inaccessible 98f Wallet, it is indisputable that the ETH that Prime transferred to Abra to satisfy its withdrawal requests could not be the same ETH that Abra had originally transferred to Prime.  The ETH that Abra received was purchased by Prime using commingled fiat that had been transferred to Prime by other customers.  Moreover, prior to Prime transferring ETH to Abra, the ETH was commingled with other ETH (transferred to Prime by Abra, Liquidity Provider, and other Prime customers) in the ~b2ea Wallet discussed above.  In short, (i) commingled fiat was used to purchase ETH, (ii) this ETH was then commingled with ETH that other customers had transferred to Prime, and (iii) commingled ETH was then transferred to Abra.

-31-

119. Certain executives at Prime seem to have undertaken steps to corrupt Prime's internal records in connection with the replacement ETH purchases to make it appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.

120. Specifically, Prime settled the ETH purchases from Liquidity Provider by "credit[ing]" the Liquidity Provider's customer account at Prime with fiat amounts equivalent to each ETH purchase.

121. To "credit" Liquidity Provider's fiat customer balance with Prime, Prime had to input a "contribution" on Prime's Internal Ledger to make it appear as if Liquidity Provider had wired fiat to Prime. However, Liquidity Provider did not actually wire fiat to Prime in connection with the ETH purchases.

122. ███████ testified on this subject as follows:

A:    So let me—let me make sure I understand what you said. You said how to get money to [Customer]. You meant how to get money to [Liquidity Provider]; right?

A:    Sorry, yeah, that's what I meant. [Liquidity Provider].

Q:    Okay. So in order to credit [Liquidity Provider's] cash account at Prime, there needed to be a contribution on the internal Ledger; is that right?

A:    Correct.

Q:    And once there is a contribution to the internal Ledger, then when [Liquidity Provider] goes to its account, it looks like there is more cash in the account; isn't that right?

A:    Correct.

Q:    There's not actually any more cash in the bank account; right?

A:    No, there is no—there is no credit of that money to the bank accounts, only to the Ledger.[29]

---

[29] ███ Dep., 155:11–156:9.

Case 25-51190-JKS   Doc 1-4   Filed 07/18/25   Page 34 of 62

123.   This method of settlement of the ETH purchases from Liquidity Provider resulted in

a discrepancy between the amount of fiat that Prime's Internal Ledger reflected and the actual amount

of fiat that Prime held in its bank accounts:

> Q:   [T]here's going to be cash reflected in [Liquidity Provider's] account, but that cash is not actually in the bank; is that right?
>
> A:   Correct.  Correct.
>
> Q:   And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?
>
> A:   Correct . . .
>
> Q:   I see.  But the Ledger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?
>
> A:   Exactly.
>
> Q:   That's ultimately what happened; right?
>
> A:   Yeah, that's exactly what happened.[30]

124.   The illustrative chart below[31] demonstrates that Prime's Internal Ledger falsely

indicated that there were "incoming" wire transfers to Liquidity Provider between December 23, 2021

and March 30, 2022:

---

[30]   *Id.* at 144:11–20; 146:7–15.

[31]   This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data related to certain transactions that was pulled from Prime's Internal Ledger.

-33-

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | **Total** | **76,367,547.90** |

125.    Prime's bank account statements do not reflect any of the above wire transfers ever occurring.

126.    For example, the above data reflects that Prime received the following incoming wire transfers: (i) $11,958,000.00 on December 23, 2021; and (ii) $12,158,250.00 on December 31, 2021. These transfers correspond with the first two replacement ETH purchases from Liquidity Provider. However, these wires are not reflected in Prime's relevant bank account statements.[32]

127.    ▮▮▮▮▮ confirmed that these purported incoming wire transfers would not be identifiable in any Prime bank account statements:

Q:    When it says funds transfer in column F and it says "wire, wire, wire." Do you see that?

A:    Yes.

Q:    There were no wire transfers; right?

A:    Yes.

Q:    Just to be clear. Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?

---

[32]    *See* Prime's December 23, 2021, and December 31, 2021, bank account statements from Signature Bank attached as **Exhibits 2 and 3**, respectively.

A:      Yes, there were no wire transfers . . .

Q:      And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?

A:      Correct.

Q:      And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?

A:      No wire transfers in.[33]

128.    As discussed herein, certain executives at Prime seem to have undertaken steps to corrupt Prime's internal record keeping.  The false entries to Prime's Internal Ledger further add to the difficulty in connecting transfers with specific transactions reflected on Prime's Internal Ledger.

## VII.    Pinttosoft's Transfers During the Preference Period

129.    To analyze the fiat and crypto transactions between Prime and Pinttosoft, I reviewed Prime's Internal Ledger, API log audit data, bank statements, bank reconciliations, and blockchain data.

130.    I identified Pinttosoft's transactions recorded in Prime's Internal Ledger by searching for internal account names attributed to Pinttosoft on the Internal Ledger.   These internal account names did not correspond with actual unique, segregated bank accounts.

131.    In my review of fiat and crypto transactions that occurred during the Preference Period,[34] I confirmed that there were outgoing transfers from Prime to or for the benefit of Pinttosoft

---

[33]        ██ Dep., 164:22–165:10; 166:5–15.

[34]    Prime and certain of its affiliates filed the above-captioned Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's preference period occurred between May 16, 2023 and August 14, 2023 (the "Preference Period").

that totaled $4,188,445.27 USD, 94.5954 AVAX, 67.9997 BTC, and 3,624,174.18 USDT (the "Transfers").

132.    All of the fiat transfers between Prime and Pinttosoft during the Preference Period were transferred from BMO x3077.

133.    All of the crypto transfers during the Preference Period were transferred from the Omnibus Digital Wallets that commingled crypto.[35]  I was able to review each of these transfers on the blockchain.

134.    I verified that each of the Transfers to or for the benefit of Pinttosoft was directed by Pinttosoft during the Preference Period based on API log audit data.[36]  Using API log audit data, I confirmed that Angel Salazar, utilizing the email address pt-api@pinttosoft.com, directed each of the Transfers for or on behalf of Pinttosoft.[37]

135.    I identified that Pinttosoft transferred $19,950 USD, 59.0075 BTC and 2,112,364.31 USDT of potential subsequent new value, and no potential subsequent new value of AVAX, to Prime after receiving certain of the Transfers.  I thus calculated the preference claim against Pinttosoft to be no less than $4,168,495.27 USD, 94.5954 AVAX, 8.9923 BTC, and 1,511,809.87 USDT (the "Preference Claim").   My analysis evaluated the transaction date and time provided in the bank and on-chain data for each incoming and outgoing transfer during the Preference Period.

* * *

---

[35]    The crypto transferred to Pinttosoft came from three separate Omnibus Digital Wallets with the following addresses:
  (i) ███████████████████████████ b2ea for transfers of 300,000 USDT;
  (ii) ███████████████████████████ 2e53 for transfers of 94.60 AVAX and 3,324,174.18 USDT;
  (iii) ███████████████████████ f907 for transfers of 68 BTC.

[36]    API log audit data identifies which customer's email initiated a transaction providing an audit trail.

[37]    Attached to this Declaration as **Exhibit 4** is API log audit data for the Transfers.

136.    In sum, blockchain data, Prime's Internal Ledger, Prime's bank account data, Prime's repeated transfers of fiat between commingled omnibus bank accounts, Prime's repeated transfers of crypto between commingled Omnibus Digital Wallets in the Vaults at Fireblocks, Prime's use of fiat transferred to Prime by other customers to purchase ETH because Prime lost access to the 98f Wallet, Prime's falsified Internal Ledger wire transfer entries covering Prime's replacement ETH purchases, and Prime's gross failures in fiat and crypto segregation, reconciliation processes, and inability to distinguish fiat or crypto transferred to Prime by certain customers from company fiat, or from fiat or crypto transferred to Prime by other customers, make it clear that Pinttosoft and Prime:  (i) cannot identify the specific fiat or crypto that Pinttosoft transferred to Prime; (ii) cannot identify which specific funds in Prime's commingled bank accounts were used for the fiat transfers from Prime to Pinttosoft during the Preference Period; and (iii) cannot identify which specific crypto in the commingled Omnibus Digital Wallets were used for the crypto transfers from Prime to Pinttosoft during the Preference Period.

Dated: July 18, 2025
        Jupiter, Florida

/s/ James P. Brennan
James P. Brennan
Senior Managing Director
J.S. Held, LLC

# EXHIBIT 1

# JP Brennan
## Senior Managing Director, Global Investigations, Cryptocurrency



## Key Expertise



- Forensic Accounting
- Anti-money Laundering ("AML")
- Compliance
- Investigations
- Damages
- Financial Crime
- Fraud
- Asset Tracing (Crypto + Traditional)
- Money Services Business ("MSBs")
- Operational Due Diligence
- Cryptocurrency Security Standard ("CCSS")
- KYC / Onboarding
- Managed / Outsourced Services

## Education

Master of Science (MS), St. John's University, 2002

Bachelor of Science (BS), St. John's University, 2001

## Project Geographical Experience

U.S., UK, Singapore, Bermuda, Canada, Bahamas, Gibraltar, Cyprus, Switzerland

## Languages

English

## Summary of Experience

JP Brennan is the Global Head of Fintech, Payments, Crypto Compliance and Investigations at J.S. Held. He brings over 20 years of experience in forensic accounting, damage calculation, auditing, litigation consulting, anti-money laundering ("AML") compliance, cryptocurrency regulatory compliance, OFAC/sanctions review, complex enhanced and operational due diligence, and bankruptcy. He has an in-depth understanding of the complexities that many FinTech's are faced with concerning their regulatory framework as well as those issues from a financial crime compliance perspective.

Mr. Brennan has substantial experience in providing complex forensic accounting and financial fraud investigative services, cryptocurrency asset / wallet tracing, development and implementation of AML programs, outsourced Chief Compliance Officer services, as well as providing managed services for large scale remediation and compliance projects. His clients include major law firms, cryptocurrency exchanges (centralized / decentralized), digital asset issuers, custodians, multinational banks, funds, payment processors, financial institutions, and investors.

His expert experience includes such high-profile matters such as Bernard L. Madoff Investment Securities (investigation), Lehman Brothers (bankruptcy investigation), Caesars Entertainment Operating Corp. (examiner report), Bank of New York-Mellon (compliance monitorship), Quadriga CX (crypto asset tracing), and LUNA Foundation Guard (crypto asset tracing).

## Speaking Engagements

Mr. Brennan has presented in various forums as well as moderated multiple cryptocurrency related panels that included topics such as investigations, risk and regulatory, asset recovery, crypto in bankruptcy as well as complex forensic tracing.

## Professional Affiliations/Memberships/Licenses/Training

Association of Certified Fraud Examiners

Certified Bitcoin Professional

## Role at J.S. Held

JP is involved with matters in consulting as well testifying expert capacity. These matters include fiat and digital asset forensic and tracing investigations, recovery of assets, the development, implementation and assessment of regulatory programs, monitorships, training for law enforcement agencies, government licensing, investigations on behalf of examiners, receivers, forensic accounting, and trustees.

## Contact

48 Wall Street, New York, NY 100436 | +1 212-952-5000 (O) | +1 917-244-8931 (M) | jp.brennan@jsheld.com

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



---

## Work Experience

J.S. Held, LLC, Senior Managing Director, 2022 – Present

Kroll, LLC (f/k/a Duff & Phelps), Associate Managing Director, 2017 – 2022

Alvarez & Marsal Holdings, LLC, Director, 2012 – 2017

FTI Consulting, Inc., Director, 2004 – 2012

Deloitte & Touche LLP, Audit Staff, 2002 – 2004

## Select Litigation and Project Experience

### Cryptocurrency and Blockchain Related:

- Retained as the cryptocurrency expert in the Chapter 11 Bankruptcy Proceedings for Prime Trust due to insolvency. Provides litigation consulting and expert witness services, related to the investigation of the company as well as performance of other analysis including but not limited fraudulent conveyances and preference payments.

- Retained by a U.S. cryptocurrency exchange as an expert to defend against customer allegations involving the exchanges breach of fiduciary duty and lack of an appropriate AML program.

- Retained in the Voyager Digital Bankruptcy to investigate and recover fraudulent ACH customer payments.

- Retained by a Web3 company that provides infrastructure and applications to be built using its platform. Perform expert and litigation services to defend against allegations of market manipulations, inappropriate disclosure for sources and uses of funds, unjust enrichment, and breach of fiduciary duty.

- Luna Foundation Guard / Terraform Labs / Do Kwon – retained to produce an audit report and cryptocurrency tracing of the assets used to defend the peg of the UST algorithmic stablecoin. Additional work related to market manipulation, wash trading, improper public disclosures, and manipulation of transactions on the Terra network.

- Retained by the Brazilian gov't to conduct the cryptocurrency asset tracing and recovery in the INDEAL pyramid scheme.

- Retained as the expert in a cryptocurrency employment dispute related to the payment of assets at genesis and calculation the associated staking rewards and airdrops on the Cosmos Network.

- Retained as the expert by the Cred Inc. Liquidation Trust to trace and investigate the theft and fraudulent transfer of assets by Company executives.

- Retained by Bo Shen in the recovery of over $40 million stolen from his personal wallet.

- QuadrigaCX – retained by the receiver (E&Y) to conduct the tracing of cryptocurrency assets.

- Retained as the financial adviser in the EminiFX bankruptcy and investigation.

- Retained by the Canadian courts in the Index Finance hack as the custodian for the cryptocurrency assets stolen.

- Retained as the expert in a well-known international gambling site dispute.

- Retained in the USA v. Ian Freeman (formerly Ian Bernard) and Aria DiMezzo (formerly James Baker) to assist with various litigation support services.

- Conducted and performed operational due diligence for financial and crypto related platforms including but not limited to: trade execution, custody, and third-party providers.

- Often retained by bitcoin atm operators, crypto lenders, crypto funds, crypto exchanges, payment processors, and funds to conduct independent AML reviews.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



- Developed and implemented tracing and monitoring processes and technologies for a crypto money servicer business ("MSBs").
- Retained by the receiver in a Canadian cryptocurrency exchange investigation and recovery of assets.
- Retained by a large Seychelles-based cryptocurrency exchange to provide a report on proper OTC related procedures.
- Successfully performed an investigation into the fraudulent theft of cryptocurrency related assets of a crypto lender.
- Member of an international FATF committee working on the Travel Rule for Virtual Asset Providers ("VASPs").
- Performed the outsourcing of cryptocurrency asset reviews for a major US Cryptocurrency Exchange.
- Provide Managed Services for enhanced due diligence procedures for a major US Cryptocurrency Exchange.
- Retained by a U.S. Cryptocurrency Exchange to address regulatory concerns regarding their geo-fencing of IP addresses.
- Retained by a U.S. crypto lender in connection with their 2017 initial coin offering ("ICO") to provide recission payments to investors.
- Conducted cryptocurrency security standard ("CCSS") implementations and assessments.
- Conduct annual FBI Training – "How to Conduct Cryptocurrency Investigations."

**Non-Cryptocurrency and Blockchain Related:**

- Provided investigative services and litigation support to the court-appointed trustee for the liquidation of Bernard L. Madoff Investment Securities and his counsel.  Engagement assistance to date has included the day-to-day direction and supervision of teams in areas including forensic investigation, data analysis and litigation consulting.
- Retained by the US Federal Reserve Bank to review AML Programs for their 12 branches.
- Served on the team selected by the U.S. Attorney offices in the Eastern and Southern Districts of New York and Western Pennsylvania to support the monitoring of the non-prosecution agreements of both The Bank of New York and Mellon Financial Corporation, to monitor and report on the state of the banks' suspicious activity reporting practices and AML procedures.
- Served on the monitorship team for the Standard Chartered Bank.
- Provided litigation consulting and expert witness services, including expert report preparation and deposition and trial preparation for a multi-billion-dollar accounting malpractice case filed in a class action against one of the major accounting firms. The case involved review and analysis of several years of audit work papers as well as research and analysis.
- Provided litigation consulting, including expert report preparation and deposition and trial preparation for an oil and gas company to determine whether a series of corporate transactions constituted a fraudulent conveyance and as a result rendered the company insolvent.
- Created onboarding policies and procedures for banks, hedge funds, as well as crypto funds and exchanges.
- Served on the investigations team, retained by Caesars Entertainment Operating Company, Inc. ("CEOC"), Richard J. Davis, to investigate and determine whether fifteen transactions between CEOC and the leveraged buyout sponsors ("LBO") arose to constituted constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty.
- Expert support work on the determination of payments to creditors in the Nortel Networks bankruptcy.
- Expert support work on the calculation of damages / lost profits for a pharmaceutical dispute.
- Expert support in the investigation into various matters within the Lehman bankruptcy.
- Expert support in the investigation of Allen Stanford.
- Provided and oversaw a team of 350+ compliance professionals to help meet a New York State Department of Financial Services remediation for a large US-based cryptocurrency exchange.
- Hired as the outsourced CCO multiple payment processors that are going through the money transmission licensing process.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



## Speaking Engagements and Articles

- Law360 article, Using Data To Arm Against Future Crypto Market Turbulence", December 16, 2022.
- Luna Foundation Guard release, "Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022", November 16, 2022.
- Brave NewCoin article, "The Cryptocurrency Regulatory Framework: How Countries are Approaching the Virtual Currency", March 2022.
- Wolters Kluwer Banking and Financial Services Policy Report – April 30, 2019, "The Curios Case of Crypto."
- Kroll article, "Cryptocurrencies: Protecting Your Downside in the Face of Uncertainty", May 2018.
- Medium Article Contributor: https://medium.com/@james.p.brennan1.
- Official Monetary and Financial Institutions Forum ("OMFIF") Digital Monetary Institute Symposium 2021, "Cryptocurrency's Regulatory Impact", September 2021.
- MIT: Center for Real Estate," Real Disruption - How Technology is Changing and Challenging Real Estate", 2017.
- Kroll, "Examining the Anti-Money Laundering (AML) Risks and Red Flags of Crypto Exchanges", October 2021.
- BPP Continuing Education, "What you need to know when your clients are considering crypto", 2021.
- Association of Certified Fraud Examiners, "The Future of AML and Blockchain", May 2021.
- JS Held Thought Leadership Related Articles.

## Testimony

- *Michael Sofaer v. BKCM, LLC, Supreme Court of the State of New York, Country of New York.*
- *Paul Merkley v. Gemini Trust Company, LLC*, JAMS Arbitration.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

# EXHIBIT 2

**Signature** | **SIGNATURE BANK**

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|---|---|---|
| | OBI: ████████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 236,562.50 |
| | REF# ████████████ | |
| | FROM: MARXSMITH LLC     ABA:  026009593 | |
| | BANK: | |
| | OBI: ████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 250,000.00 |
| | REF# ████████████ | |
| | FROM: ██████████     ABA:  021000021 | |
| | BANK: | |
| | OBI: █████ | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 250,000.00 |
| | REF# ████████████ | |
| | FROM: PAXFUL USA INC     ABA:  026013356 | |
| | BANK: | |
| | OBI: ████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 22 | INCOMING WIRE | 300,000.00 |
| | REF# ████████████ | |
| | FROM: ICHIOKA VENTURES LLC     ABA:  121000248 | |
| | BANK: | |
| | OBI: ██████████ | |
| | OBI: | |
| | OBI: | |
| Dec 22 | ONLINE TRANSFER CREDIT | 60,000,000.00 |
| | ONLINE XFR FROM: XXXXXX6223 | |
| Dec 23 | INCOMING WIRE | 26.00 |
| | REF# ████████████ | |
| | FROM: CP CONSTRUCTION VENTURES LLC     ABA:  324377613 | |
| | BANK: | |
| | OBI: ██████ | |
| | OBI: | |



# SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   141 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126        0

| Date | Description | |
|---|---|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200.00 |
| | REF# ██████████████ | |
| | FROM: █████████████     ABA:  31209536 | |
| | BANK: ██████████ | |
| | OBI: ██████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 400.00 |
| | REF# ██████████████ | |
| | FROM: ASIAM RESOURCES LLC     ABA:  121000248 | |
| | BANK: | |
| | OBI: ██████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800.00 |
| | REF# █████████████ | |
| | FROM: SYNAPSE FINANCIAL TECHNOLOGIES   ABA:  084106768 | |
| | BANK: | |
| | OBI: ███████████████████████████████ | |
| | OBI: ███████████████████████████████ | |
| | OBI: ████████████ | |
| Dec 23 | INCOMING WIRE | 2,000.00 |
| | REF# █████████████ | |
| | FROM: 1/FBO ████████     ABA:  NFSCUS3B | |
| | BANK: ████████████ | |
| Dec 23 | INCOMING WIRE | 2,675.00 |
| | REF# █████████████ | |
| | FROM: ████████     ABA:  021000021 | |
| | BANK: | |
| | OBI: ██████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 4,545.00 |
| | REF# █████████████ | |
| | FROM: HERMANN, LLC     ABA:  021000021 | |
| | BANK: | |
| | OBI: █████████████████████ | |
| | OBI: | |

 SIGNATURE BANK

Statement Period
From December  01, 2021
To   December  31, 2021
Page   142 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126        0

| Date | Description | |
|------|-------------|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,000.00 |
| | REF# ██████████████ | |
| | FROM: ███████████  ABA:  321178158 | |
| | BANK: ██████████ | |
| | OBI: ████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,500.00 |
| | REF# ██████████████ | |
| | FROM: ████████  ABA:  121000248 | |
| | BANK: | |
| | OBI: ███████  ███████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 6,000.00 |
| | REF# ██████████████ | |
| | FROM: LA GUACAMAYA LLC  ABA:  021000021 | |
| | BANK: | |
| | OBI: ████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 7,955.00 |
| | REF# ██████████████ | |
| | FROM: BANK OF AMERICA  ABA:  026013576 | |
| | BANK: ███████ | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF# ██████████████ | |
| | FROM: █████████  ABA:  31209536 | |
| | BANK: ███████ | |
| | OBI: ██████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF# ██████████████ | |
| | FROM: ████████  ABA:  021000021 | |
| | BANK: | |
| | OBI: ████████████████ | |
| | OBI: | |

 SIGNATURE BANK

```
                                          Statement Period
                                     From December  01, 2021
                                     To   December  31, 2021
                                     Page   143 of  426

                                     PRIVATE CLIENT GROUP 159
                                     485 MADISON AVENUE
                                     NEW YORK, NY 10022


          PRIME TRUST LLC                 8-159
          BAM CLEARING
          330 S RAMPART BLVD SUITE 260
          LAS VEGAS NV  89145
                                          See Back for Important Information


                              Primary Account: ████6126        0
```

| Date | Description | |
|------|-------------|--:|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 9,500.00 |
| | REF# ████████████████ | |
| | FROM: ██████████   ABA:  121000248 | |
| | BANK: | |
| | OBI: █████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,000.00 |
| | REF# ██████████████ | |
| | FROM: ██████ OR ███████   ABA:  021000021 | |
| | BANK: | |
| | OBI: █████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,500.00 |
| | REF# ██████████████ | |
| | FROM: COMMODORE MANAGEMENT LLC   ABA:  102000021 | |
| | BANK: | |
| | OBI: ████████████████████ | |
| | OBI: ████████ | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 14,700.00 |
| | REF# █████████████ | |
| | FROM: ███████   ABA:  026009593 | |
| | BANK: | |
| | OBI: ████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 19,782.95 |
| | REF# █████████████ | |
| | FROM: INTERNATIONAL TRADING COMMERCE   ABA:  021201383 | |
| | BANK: ██████████ | |
| | OBI: ████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 23,400.00 |
| | REF# █████████████ | |
| | FROM: TECC CONSULTING LLC   ABA:  121000248 | |

# SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|------|-------------|---|
| | BANK: | |
| | OBI: ████████████████ | |
| | OBI : | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 23,500.00 |
| | REF# ███████████████ | |
| | FROM: ██████████████    ABA:  026009593 | |
| | BANK: ██████████████ | |
| | OBI : ████████ | |
| | OBI : | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,000.00 |
| | REF# ███████████████ | |
| | FROM: ████████████    ABA:  121000248 | |
| | BANK: | |
| | OBI : ████████ | |
| | OBI : | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,000.00 |
| | REF# ███████████████ | |
| | FROM: ████████████    ABA:  121000248 | |
| | BANK: | |
| | OBI : ████████ | |
| | OBI : | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,080.00 |
| | REF# ███████████████ | |
| | FROM: UR CHOICE DISTRUBUTOR INC.    ABA:  021000021 | |
| | BANK: | |
| | OBI : █████████████ | |
| | OBI : | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 33,000.00 |
| | REF# ███████████████ | |
| | FROM: PND ADMINISTRATION SERVICES LLC    ABA:  021000021 | |
| | BANK: | |
| | OBI: ████████████████████████████ | |
| | OBI : | |
| | OBI: | |

**Signature** | **SIGNATURE BANK**

Statement Period
From December 01, 2021
To   December 31, 2021
Page  145 of  426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126        0

| Date | Description | |
|------|-------------|---|
| Dec 23 | INCOMING WIRE | 33,000.00 |
| | REF# ████████ | |
| | FROM: INOVASUPERSTAR LLC          ABA:  021000021 | |
| | BANK: | |
| | OBI: ██████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 45,561.25 |
| | REF# ████████ | |
| | FROM: PRIZEOUT CORP               ABA:  026009593 | |
| | BANK: | |
| | OBI: ███████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 46,883.81 |
| | REF# ████████ | |
| | FROM: VIRTUAL ASSETS LLC          ABA:  071902399 | |
| | BANK: | |
| | OBI: ████████     ███████████ | |
| | OBI: ████████ | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 60,000.00 |
| | REF# ████████ | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE  ABA:  061110654 | |
| | BANK: | |
| | OBI: ██████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 64,000.00 |
| | REF# ████████ | |
| | FROM: WAAVE TECHNOLOGIES INC.      ABA:  021000021 | |
| | BANK: | |
| | OBI: ████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 83,836.50 |
| | REF# ████████ | |
| | FROM: DIGITAL ASSET MANAGEMENT LIMIT  ABA:  026013576 | |
| | BANK: | |

# SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page  146 of  426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126          0

| Date | Description | |
|------|-------------|---|
| | OBI: ████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 139,054.69 |
| | REF# ████████████ | |
| | FROM: PRIME TRUST, LLC AS AGENT FOR   ABA:  044000024 | |
| | BANK: | |
| | OBI: ████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 196,000.00 |
| | REF# ████████████ | |
| | FROM: MUNDUZ INTERNATIONAL INCORPORATED   ABA:  021000021 | |
| | BANK: | |
| | OBI: ████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200,000.00 |
| | REF# ████████████ | |
| | FROM: EMBLAZE ONE INC.   ABA:  021000021 | |
| | BANK: | |
| | OBI: ██████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 212,500.00 |
| | REF# ████████████ | |
| | FROM: WESUPPLY SOLUTIONS, LLC   ABA:  043000096 | |
| | BANK: ██████ | |
| | OBI: ████████████████ | |
| | OBI: ██ | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 233,471.25 |
| | REF# ████████████ | |
| | FROM: NORTH AMERICAN CAPACITY INSURANCE   ABA:  026009593 | |
| | BANK: | |
| | OBI: ████████████████ | |
| | OBI: ████████████████ | |
| | OBI: ██████ | |
| Dec 23 | INCOMING WIRE | 236,562.50 |

**Signature** | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|---|---|---|
| | REF# | |
| | FROM: MARXSMITH LLC | ABA:  026009593 |
| | BANK: | |
| | OBI: | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 250,000.00 |
| | REF# | |
| | FROM: | ABA:  021000021 |
| | BANK: | |
| | OBI: | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 334,000.00 |
| | REF# | |
| | FROM: YUMMY INC | ABA:  211075086 |
| | BANK: | |
| | OBI: | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 357,000.00 |
| | REF# | |
| | BANK: M&T BANK | |
| | OBI: | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 500,000.00 |
| | REF# | |
| | FROM: DISTRIBUTED COMPUTING SYSTEMS | ABA:  026013576 |
| | BANK: | |
| | OBI: | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800,000.00 |
| | REF# | |
| | FROM: CB INTERNATIONAL BANK LLC | ABA:  026013576 |
| | BANK: | |
| | OBI: | |
| | OBI: | |



**SIGNATURE BANK**

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | |
|------|-------------|--|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,000,000.00 |
| | REF# ███████████████████ | |
| | FROM: DCG INTERNATIONAL INVESTMENTS LTD   ABA:  322286803 | |
| | BANK: | |
| | OBI: ██████████████████████████████ | |
| | OBI: ██████████████████████████████ | |
| | OBI: █ | |
| Dec 23 | INCOMING WIRE | 1,199,500.00 |
| | REF# ████████████████ | |
| | FROM: LEGEND TRADING INC          ABA:  026013576 | |
| | BANK: | |
| | OBI: ████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,298,000.00 |
| | REF# ███████████████ | |
| | FROM: LEGEND TRADING INC          ABA:  026013576 | |
| | BANK: | |
| | OBI: █████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1.00 |
| | REF# ████████████████ | |
| | FROM: CP CONSTRUCTION VENTURES LLC    ABA:  324377613 | |
| | BANK: | |
| | OBI: ████████ | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF# ████████████████ | |
| | FROM: █████████████        ABA:  021000021 | |
| | BANK: | |
| | OBI: ██████ | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF# ████████████████ | |
| | FROM: █████████████        ABA:  021000021 | |

# EXHIBIT 3



# SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126        0

| Date | Description | |
|---|---|---|
| | BANK: M&T BANK | |
| | OBI: ███████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 236,562.50 |
| | REF# ██████████████ | |
| | FROM: MARXSMITH LLC        ABA:  026009593 | |
| | BANK: | |
| | OBI: ██████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 312,000.00 |
| | REF# ██████████████ | |
| | FROM: YUMMY INC           ABA:  211075086 | |
| | BANK: | |
| | OBI: █████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 350,000.00 |
| | REF# ██████████████ | |
| | FROM: PROGLOBIX LLC       ABA:  071000288 | |
| | BANK: | |
| | OBI: █████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 1,918.00 |
| | REF# ██████████████ | |
| | FROM: ECN OTC, LLC        ABA:  021000021 | |
| | BANK: | |
| | OBI: ████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 2,105.00 |
| | REF# ██████████████ | |
| | FROM: PRIME TRUST LLC     ABA:  021000089 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 2,500.00 |
| | REF# ██████████████ | |
| | FROM: ██████████ OR ██████████   ABA:  021000021 | |


**SIGNATURE BANK**

Statement Period
From December 01, 2021
To   December 31, 2021
Page   173 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126          0

| Date | Description | |
|------|-------------|--|
| | BANK: | |
| | OBI: ██████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 4,618.97 |
| | REF# ███████████████████ | |
| | FROM: ████████████████  ABA:  121000248 | |
| | BANK: | |
| | OBI: ███████████████ | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 5,400.00 |
| | REF# ████████████████ | |
| | FROM: COMMODORE MANAGEMENT LLC  ABA:  102000021 | |
| | BANK: | |
| | OBI: █████████████████████████████ | |
| | OBI: █████ | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 10,000.00 |
| | REF# ███████████████ | |
| | FROM: █████████  ABA:  121105156 | |
| | BANK: | |
| | OBI: ██████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 15,000.00 |
| | REF# ██████████████ | |
| | FROM: █████████  ABA:  124003116 | |
| | BANK: | |
| | OBI: ████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 17,780.00 |
| | REF# ██████████████ | |
| | FROM: ████████████  ABA:  062005690 | |
| | BANK: | |
| | OBI: ████████████████████ | |
| | OBI: | |
| | OBI: | |

**Signature | SIGNATURE BANK**

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | | |
|------|-------------|---|---|
| Dec 31 | INCOMING WIRE | | 20,802.00 |
| | REF# ████████████ | | |
| | FROM: ████████ | ABA: 021000089 | |
| | BANK: | | |
| Dec 31 | INCOMING WIRE | | 25,000.00 |
| | REF# ████████████ | | |
| | FROM: ██████████ | ABA: 121000248 | |
| | BANK: | | |
| | OBI: ████████████ | | |
| | OBI: | | |
| | OBI: | | |
| Dec 31 | INCOMING WIRE | | 26,000.00 |
| | REF# ████████████ | | |
| | FROM: INOVASUPERSTAR LLC | ABA: 021000021 | |
| | BANK: | | |
| | OBI: ████████████████████ | | |
| | OBI: | | |
| | OBI: | | |
| Dec 31 | INCOMING WIRE | | 28,500.00 |
| | REF# ████████████ | | |
| | FROM: JAMES BUTLER DBA BUTLER HOME MAINT | ABA: 114000093 | |
| | BANK: | | |
| | OBI: ████ | | |
| | OBI: | | |
| | OBI: | | |
| Dec 31 | INCOMING WIRE | | 32,100.00 |
| | REF# ████████████ | | |
| | FROM: TECC CONSULTING LLC | ABA: 121000248 | |
| | BANK: | | |
| | OBI: ██████████ | | |
| | OBI: | | |
| | OBI: | | |
| Dec 31 | INCOMING WIRE | | 35,630.00 |
| | REF# ████████████ | | |
| | FROM: ██████████ | ABA: 043318092 | |
| | BANK: | | |
| | OBI: ████████████████ | | |
| | OBI: | | |
| | OBI: | | |

# SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022


PRIME TRUST LLC                      8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information


Primary Account: ███████6126          0

| Date | Description | |
|------|-------------|--|
| Dec 31 | INCOMING WIRE | 70,000.00 |
| | REF# ██████████████ | |
| | FROM: COIN TIME LLC                ABA:  121000248 | |
| | BANK: | |
| | OBI: ██████████████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 121,100.00 |
| | REF# ██████████████ | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT   ABA:  322070381 | |
| | BANK: | |
| | OBI: █████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 130,000.00 |
| | REF# ██████████████ | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE   ABA:  061110654 | |
| | BANK: ████████████ | |
| | OBI: ███████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 150,000.00 |
| | REF# ██████████████ | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT   ABA:  322070381 | |
| | BANK: | |
| | OBI: █████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 172,620.30 |
| | REF# ██████████████ | |
| | FROM: INTERNATIONAL TRADING COMMERCE MAR   ABA:  066015084 | |
| | BANK: ███████ | |
| | OBI: ████████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 236,562.50 |
| | REF# ██████████████ | |
| | FROM: MARXSMITH LLC                ABA:  026009593 | |
| | BANK: | |

**SIGNATURE BANK**

Statement Period
From December 01, 2021
To    December 31, 2021
Page   176 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                      8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126        0

| Date | Description | |
|---|---|---|
| | OBI: ████████████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 300,000.00 |
| | REF# ████████████ | |
| | FROM: 1/██████████ ABA:  NFSCUS3B | |
| | BANK: ████████ | |
| Dec 31 | INCOMING WIRE | 600,000.00 |
| | REF# ████████████ | |
| | FROM: EMBLAZE ONE INC.      ABA:  021000021 | |
| | BANK: | |
| | OBI: █████████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,000,000.00 |
| | REF# ████████████ | |
| | FROM: COMPASS MINING INC    ABA:  026013576 | |
| | BANK: | |
| | OBI: ████ | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,450,000.00 |
| | REF# ████████████ | |
| | FROM: PRIME TRUST LLC       ABA:  021000021 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 6,500,000.00 |
| | REF# ████████████ | |
| | FROM: ████    ABA:  026013576 | |
| | BANK: | |
| | OBI: ████████████████████ | |
| | OBI: ███████████████ | |
| | OBI: | |

Withdrawals and Other Debits

| Date | Description | |
|---|---|---|
| Dec 01 | OUTGOING WIRE | 5.00 |
| | REF# ████████ | |
| | TO:   1/████████    ABA:  021000021 | |
| | BANK: ████████████  ████████ | |
| | OBI: ██████████ | |

# EXHIBIT 4

| cash_transacti | organization.label | account.number | incoming_or_outgoing | cash_transactions.amount | cash_transactions.id | activities.user_email | activities.user_name |
|---|---|---|---|---|---|---|---|
| 5/16/2023 | Pinttosoft LLC | 4300 | Outgoing | (99,993.76) | f227a | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | Pinttosoft LLC | 1340 | Outgoing | (20,000.00) | 41a5 | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | Pinttosoft LLC | 1649 | Outgoing | (48,000.00) | d73b | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | Pinttosoft LLC | 1377 | Outgoing | (30,000.00) | 7bf3 | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | Pinttosoft LLC | 1377 | Outgoing | (18,000.00) | a908 | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | Pinttosoft LLC | 4824 | Outgoing | (36,092.00) | 6012 | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | Pinttosoft LLC | 5403 | Outgoing | (200,195.00) | 07ec | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 9802 | Outgoing | (23,500.00) | 55b8 | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 4751 | Outgoing | (16,975.00) | d586 | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 9914 | Outgoing | (13,205.00) | d5a9 | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 8395 | Outgoing | (29,205.00) | d6aa | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 1649 | Outgoing | (21,919.74) | 8ece | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 1808 | Outgoing | (20,000.00) | 48cd | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 9198 | Outgoing | (60,070.64) | e848 | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | Pinttosoft LLC | 4751 | Outgoing | (17,350.00) | 8ccc | pt-api@pinttosoft.com | angel salazar |
| 5/18/2023 | Pinttosoft LLC | 6473 | Outgoing | (30,000.00) | 24ad | pt-api@pinttosoft.com | angel salazar |
| 5/18/2023 | Pinttosoft LLC | 2865 | Outgoing | (19,816.00) | a6c4 | pt-api@pinttosoft.com | angel salazar |
| 5/22/2023 | Pinttosoft LLC | 9198 | Outgoing | (448,400.00) | 2c32 | pt-api@pinttosoft.com | angel salazar |
| 5/24/2023 | Pinttosoft LLC | 1444 | Outgoing | (215.00) | 7315 | pt-api@pinttosoft.com | angel salazar |
| 5/24/2023 | Pinttosoft LLC | 1444 | Outgoing | (52,652.00) | 44ac | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | Pinttosoft LLC | 9257 | Outgoing | (109,316.00) | ecf4 | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | Pinttosoft LLC | 9198 | Outgoing | (164,350.00) | c7eb | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | Pinttosoft LLC | 3389 | Outgoing | (5,000.00) | bbd3 | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | Pinttosoft LLC | 9499 | Outgoing | (34,359.04) | 468f | pt-api@pinttosoft.com | angel salazar |
| 5/26/2023 | Pinttosoft LLC | 3389 | Outgoing | (4,950.00) | f74a | pt-api@pinttosoft.com | angel salazar |
| 5/26/2023 | Pinttosoft LLC | 4300 | Outgoing | (12,100.00) | 0279 | pt-api@pinttosoft.com | angel salazar |
| 5/26/2023 | Pinttosoft LLC | 2865 | Outgoing | (21,806.00) | ccfe | pt-api@pinttosoft.com | angel salazar |
| 5/30/2023 | Pinttosoft LLC | 9257 | Outgoing | (591,650.00) | ba98 | pt-api@pinttosoft.com | angel salazar |
| 5/31/2023 | Pinttosoft LLC | 6482 | Outgoing | (685.00) | a327 | pt-api@pinttosoft.com | angel salazar |
| 6/1/2023 | Pinttosoft LLC | 6482 | Outgoing | (1,275.00) | 7781 | pt-api@pinttosoft.com | angel salazar |
| 6/2/2023 | Pinttosoft LLC | 6482 | Outgoing | (285.00) | 9020 | pt-api@pinttosoft.com | angel salazar |
| 6/2/2023 | Pinttosoft LLC | 9257 | Outgoing | (298,350.00) | 534b | pt-api@pinttosoft.com | angel salazar |
| 6/2/2023 | Pinttosoft LLC | 2865 | Outgoing | (6,603.00) | e721 | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | Pinttosoft LLC | 6051 | Outgoing | (29,600.00) | ae62 | pt-api@pinttosoft.com | angel salazar |
| 6/7/2023 | Pinttosoft LLC | 9198 | Outgoing | (99,334.00) | 5936 | pt-api@pinttosoft.com | angel salazar |
| 6/7/2023 | Pinttosoft LLC | 9257 | Outgoing | (199,160.00) | c15c | pt-api@pinttosoft.com | angel salazar |
| 6/8/2023 | Pinttosoft LLC | 2865 | Outgoing | (46,140.00) | 70ee | pt-api@pinttosoft.com | angel salazar |
| 6/9/2023 | Pinttosoft LLC | 2865 | Outgoing | (13,952.00) | b5a1 | pt-api@pinttosoft.com | angel salazar |
| 6/9/2023 | Pinttosoft LLC | 9257 | Outgoing | (498,413.00) | cca3 | pt-api@pinttosoft.com | angel salazar |
| 6/9/2023 | Pinttosoft LLC | 2865 | Outgoing | (9,396.00) | 8a6d | pt-api@pinttosoft.com | angel salazar |
| 6/13/2023 | Pinttosoft LLC | 9257 | Outgoing | (72,170.00) | 24cd | pt-api@pinttosoft.com | angel salazar |
| 6/15/2023 | Pinttosoft LLC | 6051 | Outgoing | (44,325.00) | 62b4 | pt-api@pinttosoft.com | angel salazar |
| 6/15/2023 | Pinttosoft LLC | 9198 | Outgoing | (499,970.00) | 1854 | pt-api@pinttosoft.com | angel salazar |
| 6/15/2023 | Pinttosoft LLC | 6482 | Outgoing | (4,955.00) | bd61 | pt-api@pinttosoft.com | angel salazar |
| 6/15/2023 | Pinttosoft LLC | 9257 | Outgoing | (149,460.00) | 4d0e | pt-api@pinttosoft.com | angel salazar |
| 6/16/2023 | Pinttosoft LLC | 7044 | Outgoing | (19,680.09) | 0890 | pt-api@pinttosoft.com | angel salazar |
| 6/16/2023 | Pinttosoft LLC | 2865 | Outgoing | (19,661.00) | 81f2 | pt-api@pinttosoft.com | angel salazar |
| 6/20/2023 | Pinttosoft LLC | 3510 | Outgoing | (172.00) | 9088 | pt-api@pinttosoft.com | angel salazar |
| 6/20/2023 | Pinttosoft LLC | 2865 | Outgoing | (25,739.00) | 1547 | pt-api@pinttosoft.com | angel salazar |

| asset_transfers.created_date | asset_transfers.id | organizations.label | accounts.number | asset_transfers.unit_count | assets.label | activities.user_email | activities.user_name |
|---|---|---|---|---|---|---|---|
| 6/21/2023 | f256 | Pinttosoft LLC | 6482 | -800 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/21/2023 | 6f27 | Pinttosoft LLC | 3796 | -45 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/21/2023 | cd1f | Pinttosoft LLC | 3796 | -375 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/21/2023 | 0454 | Pinttosoft LLC | 3796 | -100 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/20/2023 | e0de | Pinttosoft LLC | 6482 | -300 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/20/2023 | 9352 | Pinttosoft LLC | 6482 | -400 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/19/2023 | 568b | Pinttosoft LLC | 3796 | -200 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/19/2023 | a9e9 | Pinttosoft LLC | 6482 | -400 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/16/2023 | 4d52 | Pinttosoft LLC | 6482 | -200 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/14/2023 | 1ee6 | Pinttosoft LLC | 3796 | -250000 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/15/2023 | af66 | Pinttosoft LLC | 6482 | -2500 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/15/2023 | 83d6 | Pinttosoft LLC | 6482 | -100 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/15/2023 | 1a02 | Pinttosoft LLC | 3796 | -801500 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/14/2023 | fe21 | Pinttosoft LLC | 3796 | -0.0042 | Bitcoin | pt-api@pinttosoft.com | angel salazar |
| 6/14/2023 | faa2 | Pinttosoft LLC | 3796 | -8.9998724 | Bitcoin | pt-api@pinttosoft.com | angel salazar |
| 6/14/2023 | 5081 | Pinttosoft LLC | 3796 | -10 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/14/2023 | cd25 | Pinttosoft LLC | 3796 | -58.9956724 | Bitcoin | pt-api@pinttosoft.com | angel salazar |
| 6/14/2023 | 55a0 | Pinttosoft LLC | 3796 | -500701 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/12/2023 | b5ab | Pinttosoft LLC | 3796 | -80 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/9/2023 | 1830 | Pinttosoft LLC | 6482 | -498 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/8/2023 | d171 | Pinttosoft LLC | 6482 | -498 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/7/2023 | e645 | Pinttosoft LLC | 6482 | -349 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/7/2023 | a0b8 | Pinttosoft LLC | 3796 | -2 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/7/2023 | 42a5 | Pinttosoft LLC | 3796 | -199998 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/7/2023 | 3788 | Pinttosoft LLC | 3796 | -115 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | 3bc8 | Pinttosoft LLC | 3796 | -5 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | 22e0 | Pinttosoft LLC | 3796 | -5 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | 4100 | Pinttosoft LLC | 3796 | -5 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | 73fb | Pinttosoft LLC | 3796 | -5 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | 8ab3 | Pinttosoft LLC | 3796 | -5 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | 07b9 | Pinttosoft LLC | 3796 | -5 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/5/2023 | c15b | Pinttosoft LLC | 3796 | -5 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 6/2/2023 | 948d | Pinttosoft LLC | 3796 | -300000 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/31/2023 | 5669 | Pinttosoft LLC | 3796 | -1864 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/30/2023 | 9db0 | Pinttosoft LLC | 3796 | -595050 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/30/2023 | 81f3 | Pinttosoft LLC | 3796 | -3789 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/29/2023 | 1b6d | Pinttosoft LLC | 3796 | -19888 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/26/2023 | 83ec | Pinttosoft LLC | 3796 | -249 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | af3f | Pinttosoft LLC | 3796 | -200 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | 20a6 | Pinttosoft LLC | 3796 | -285090 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | fe94 | Pinttosoft LLC | 6473 | -151 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | b013 | Pinttosoft LLC | 3867 | -1900.805 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | f49f | Pinttosoft LLC | 3867 | -94.5954107 | Avalanche (C-Chain) | pt-api@pinttosoft.com | angel salazar |
| 5/25/2023 | 904a | Pinttosoft LLC | 9802 | -40 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/24/2023 | 5ec4 | Pinttosoft LLC | 6482 | -117 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/23/2023 | 393a | Pinttosoft LLC | 3796 | -1296 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/20/2023 | 8e7e | Pinttosoft LLC | 0601 | -3680.37 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/19/2023 | 284e | Pinttosoft LLC | 3796 | -10 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/19/2023 | a30b | Pinttosoft LLC | 3796 | -44990 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/19/2023 | 5496 | Pinttosoft LLC | 3796 | -404990 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/19/2023 | 9035 | Pinttosoft LLC | 3796 | -49931 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/19/2023 | 96a1 | Pinttosoft LLC | 6482 | -300 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/18/2023 | 14ae | Pinttosoft LLC | 6482 | -125 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | 4f6f | Pinttosoft LLC | 6482 | -500 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/17/2023 | c526 | Pinttosoft LLC | 6594 | -102 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | 79d2 | Pinttosoft LLC | 3796 | -149987 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | c3f6 | Pinttosoft LLC | 6594 | -209 | Tether USD | pt-api@pinttosoft.com | angel salazar |
| 5/16/2023 | 9d60 | Pinttosoft LLC | 6482 | -499 | Tether USD | pt-api@pinttosoft.com | angel salazar |